UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALLACE STEWART, ROSELL MATIENZO, and RODCELYN MATIENZO, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANKERS HEALTHCARE GROUP, LLC and PINNACLE BANK,<br><br>Defendants. | Case No.: 5:23-cv-1284 (GTS/TWD)<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Pursuant to Fed. R. Civ. P. 23, Plaintiffs Wallace Stewart, Rosell Matienzo, and Rodcelyn Matienzo hereby initiate this class action on behalf of themselves and all other individuals (the "Class") who signed or co-signed a financial loan from Bankers Healthcare Group, LLC or Pinnacle Bank, in an amount of $20,000 or more, under a promissory note identifying the "Debtor" as a "Sole Proprietor" or as a natural person doing business as ("d/b/a") himself or herself. Plaintiffs make the following allegations based on the investigation of their counsel, and based on personal knowledge as to themselves and their own acts and dealings with the Defendants. Plaintiffs and their counsel believe that substantial, additional evidentiary support will exist for the allegations herein after a reasonable opportunity for discovery.

**INTRODUCTION**

1.      For approximately eight years, Defendants Bankers Healthcare Group, LLC ("BHG") and Pinnacle Bank ("Pinnacle") have engaged together in marketing and extending financial loans to individuals nationwide.

2. This case arises out of Defendants' recurring practice of extending large, expensive financial loans to middle-income individuals, while falsely disguising those loans as "commercial loans" to businesses that Defendants know do not exist. Fraudulently disguising their personal loans as business loans (to non-existent "sole proprietorships") allows Defendants to conceal their predatory lending practices, which squarely violate federal and state consumer-lending statutes.

3. Defendants' predatory lending practices include, without limitation: (a) imposing excessive loan fees and interest, without the attendant financial disclosures required by law for consumers; (b) penalizing and outright prohibiting borrower prepayments, to maximize interest accrual; (c) charging borrowers interest on undisbursed funds; and (d) securing all loans with "All Property of the Debtor"—both real and personal—without the financial disclosures and other consumer protections required by law for such security agreements. Such predatory lending tactics have allowed Defendants to boost their shared assets and revenues by approximately eight or nine figures in recent years, at the expenses of tens of thousands of individual consumers nationwide.

4. Plaintiffs Wallace Stewart, Rosell Matienzo, and Rodcelyn Matienzo are individual consumers who BHG directly and intentionally misled into taking out high-cost, secured personal loans with BHG or with Pinnacle. Because Defendants declined to make the disclosures required by statute for such loans, Plaintiffs were unaware of the true costs of credit when BHG induced them to e-sign their fraudulent loan agreements.

5. For approximately eight years running, Defendants have collaborated to solicit tens of thousands of consumers to take out large, personal loans in five-figure and six-figure dollar amounts. Defendants primarily target consumers who they know to be middle-income, W-2 employees like Plaintiffs, working full time in their respective fields.

6.      Using phone calls, electronic correspondence, and mail solicitations sent to consumers' home addresses, BHG typically begins Defendants' solicitation process by offering consumers quick funding in large dollar amounts. BHG's solicitations promise that Defendants' loans will not impact the consumer's credit score or credit report, and will not require collateral. These solicitations have proven appealing to many consumers, but they are materially false and misleading. The solicitations are false because Defendants' loans require *all* of the borrower's property as collateral. The solicitations are also misleading, insofar as Defendants avoid consumer credit reporting only by fraudulently drafting and reporting their loans as *business loans*, to businesses that Defendants know are non-existent.

7.      When people respond to BHG's mail or electronic solicitations, the remainder of Defendants' sales process takes place almost exclusively by telephone, and through text messages to consumers' mobile phones. BHG sometimes solicits consumers to borrow from Pinnacle, which owns 49% of BHG, and sometimes solicits consumers to borrower from BHG. During BHG's oral sales process, BHG obtains basic information about a consumer's employment and personal financial position.

8.      If Defendants are satisfied with the consumer's employment income and personal financial position, then BHG proceeds with the remainder of its deceptive sales process. BHG floats some prospective financial terms, for which the consumer will purportedly pre-qualify. These orally disclosed terms typically focus on the loan's principal amount, term, and monthly payment amounts, with maybe passing mention of an interest rate, but little or no mention of loan fees or other important financial terms (such as prepayment prohibitions and security interests).

9.      In many cases, such as Plaintiffs', consumers orally inform BHG of their intended personal use(s) for the loan proceeds, such as consolidating credit-card debt, paying personal

income taxes, or making home improvements. After a consumer agrees to apply for one of Defendants' loans, BHG typically fills out most or all of the loan application *itself*, without the consumer having to fill out important fields. The consumer need only click through and "DocuSign" extensive, electronic paperwork provided by Defendants. BHG personnel routinely persuade consumers to click through Defendants' extensive paperwork online, during a sales call, while the consumer remains on the phone with a BHG employee. Defendants' loan documents are primarily written in fine-print and in "legalese."

10. Even where consumers voice questions or concerns about certain terms in Defendants' loan documents, BHG personnel are trained to orally explain away predatory terms as innocuous, earning the consumer's trust with their interpersonal charisma and apparent professional knowledge. For example, when Plaintiff Rosell Matienzo orally asked BHG why her pre-filled loan documents included "sole proprietor" language, and further stated, "I have no business," BHG's employee told her not to worry, that it was "just a field we have to fill out," and that "we just have to put something in there." The truth, however, was that BHG sent her *commercial* loan documents, only to create a false paper-trail of what BHG knew to be a *consumer* loan marketed and originated in violation of law. As detailed herein, Plaintiff Stewart had a similar experience with BHG, when BHG solicited him to take out a loan with its substantial owner and controller, Pinnacle.

11. Once BHG induces a consumer to click through Defendants' pre-filled loan documents, the deal is done. The consumer (arguably) becomes obligated to satisfy Defendants' predatory financial terms or face default, triggering the consumer's loss of "All Property." Defendants' predatory financial terms include: (a) prepayment penalties and lockout periods; (b) excessive origination fees, totaling up to 10% of principal; (c) excessive interest rates, often

exceeding 20% annually; and (d) *partial* loan disbursements, with interest charged over time against the *undisbursed* principal amount. Defendants do not disclose these charges to consumers in the manner required by law (to the extent such charges are even allowed by law). Consequently, borrowers remain largely uninformed of Defendants' expensive and punitive credit terms, until well after a transaction is executed.

12. That result is exactly what federal lending statutes exist to prevent. This nationwide class action seeks financial and equitable relief from Defendants' wrongful conduct, on behalf of Plaintiffs and thousands of severely damaged Class members.

## PARTIES

13. Plaintiff Rosell Matienzo ("Rosell") is a California citizen who BHG induced to take out a loan with BHG. When Rosell first encountered BHG in 2022, she worked, and still works, full-time as the manager of a healthcare clinic owned by a large corporation. Rosell does not have a professional license, and has worked as a W-2 employee at all relevant times.

14. Plaintiff Rodcelyn Matienzo ("Celyn") is Rosell's daughter, and a citizen of California. Celyn encountered BHG in 2022 along with her mother, and at the time, worked as a content writer and W-2 employee for a manufacturing software company. In early 2023, Celyn transitioned into working as a content manager for a marketing agency. BHG induced Celyn to co-sign her mother's loan as a joint obligor in October 2022.

15. Plaintiff Wallace Stewart ("Stewart") is Texas citizen who BHG induced to take out a loan with Pinnacle Bank, BHG's 49% owner, in 2021. When Stewart encountered BHG, he was working full-time as a W-2 employee, as a sales representative for a credit card processing company. Stewart does not have any professional license and has never owned his own business, as a sole proprietor or otherwise.

16. Defendant Bankers Healthcare Group, LLC ("BHG") is a New York limited liability company, with its principal place of business at 201 Solar Street, Syracuse, New York, 13204. BHG engages in the business of financial lending to individuals nationwide, on its own behalf and on behalf of Pinnacle Bank, BHG's 49% owner.

17. Defendant Pinnacle Bank ("Pinnacle") is a Tennessee state-chartered bank, with its principal place of business located at 150 3rd Avenue South, Suite 900, Nashville, Tennessee 37201. Pinnacle holds a 49% ownership interest in BHG, and is a wholly owned subsidiary of a publicly traded corporation, Pinnacle Financial Partners, Inc. Pinnacle engages in the business of financial lending to individuals nationwide. Since 2015, Pinnacle has invested about $189 million in BHG, and has contracted with BHG to solicit middle-income individuals to take out financial loans from Pinnacle.

## JURISDICTION AND VENUE

18. This Court has jurisdiction under 28 U.S.C. § 1331, as this action arises under the federal Truth-in-Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*

19. Venue is proper pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to this action occurred within this district.

## FACTUAL ALLEGATIONS

**BHG Defrauds Plaintiffs Rosell and Celyn Matienzo**

20. In or about October 2022, BHG mailed written advertisements for a financial loan to Rosell's home. The advertisements offered quick funding for debt consolidation. Rosell responded to BHG's mail solicitation by calling the phone number provided thereon.

21. During Rosell's phone conversation with BHG, the company represented to Rosell that the loan it was offering her would require only a "soft" credit inquiry and that, unlike Rosell's

6

credit card balances, the loan would not show up on her credit report or affect her credit score. BHG proceeded to obtain basic information regarding Rosell's personal assets and income, which she truthfully represented as coming only from her full-time employment. Rosell provided BHG with copies of her W-2 paystubs as well as personal income tax information. Rosell orally informed BHG that she was a homeowner, and that she intended to use any loan from BHG to pay off her existing credit card balances.

22. BHG never requested or obtained any information from Rosell about any business she might own, or intend to start.

23. Upon reviewing Rosell's personal finances, BHG informed Rosell that she could qualify for a substantial cash loan, in a matter of days, but that based on her income and financial history, she would need a co-signer to help her close the deal. Consequently, Rosell asked her daughter, Celyn, to co-sign the loan for her, and Celyn agreed.

24. In response, BHG called Celyn by phone to obtain information about Celyn's personal assets and income. Like Rosell, Celyn provided BHG's sales personnel with the financial information BHG requested of her: namely, Celyn's W-2 income, paystubs from employment, and personal tax return information.

25. BHG deemed Rosell's and Celyn's combined finances sufficient to extend a loan. Upon deeming their combined finances sufficient, BHG told Rosell by phone that she qualified. BHG also told Rosell telephonically that it would send her the necessary loan documents electronically, for her and Celyn to sign via DocuSign.

26. Before sending Rosell the loan documents, BHG orally prepared Rosell, in advance, to see certain language that the loan documents would contain. Specifically, BHG's personnel volunteered to Rosell that the loan documents would say "sole proprietor" on them.

Rosell orally questioned the propriety of such "sole proprietor" language, explicitly telling BHG's salesperson, "I have no business." BHG's salesperson responded by telling Rosell: (a) that "it's just a field we have to fill out" in the loan documents; and (b) that "we just have to do it this way." During these telephonic interactions, BHG led Rosell to believe that she had access to a special, preferred type of loan product simply because she worked in the healthcare industry. Rosell believed the BHG salesperson's representations in that regard.

27.     Subsequently, BHG used the personal and financial information provided to it by Rosell and Celyn to create a pre-filled "Capital Application Form," an application form that *BHG itself* filled out before electronically sending it to Rosell and Celyn for their electronic signatures. The Capital Application Form identified the "Full Legal Name of Practice/Business" as "Rosell S. Matienzo d/b/a Rosell S. Matienzo, Sole Proprietor." It identified the "Business Structure Type" as a "Sole Proprietorship." It identified the "Sole Proprietorship" as having been "Established" on January 1, 1995. And, in self-contradictory fashion—for a "Business" supposedly "Established" in 1995—BHG's *pre-filled* loan application identified the "primary use of funds" as being for "Startup" purposes. The standard, electronic promissory note that BHG sent to Rosell and Celyn contained similar, "sole proprietor" language, and purported to evidence a "commercial" loan.

28.     All such written language was verifiably false, and BHG knew it. BHG, however, had orally prepared Rosell and Celyn to see that language—in advance of sending it to them. Consequently, they both e-signed BHG's pre-filled Capital Application Form and promissory note, based on BHG's false and misleading representations regarding the same.

29.     The promissory note and accompanying loan documents purport to create crippling financial obligations against Plaintiffs Rosell and Celyn as individuals. By way of example, while the loan principal amount purports to be $90,995, BHG disbursed less than $80,000 to Rosell, as

BHG deducted from more than $11,000 in origination fees from its disbursement. BHG never disclosed such excessive origination fees to Rosell or to Celyn in the manner required by law for consumer loans. Likewise, BHG never disclosed the loan's annual percentage rate ("APR") to Rosell or Celyn in the manner required by law, even though that APR well exceeded 20%.

30. The loan documents further prohibit any borrower prepayments throughout all but the final year of the loan's six-year term. Such prepayment prohibitions are categorically barred by applicable state law. And in Rosell's and Celyn's case, they would ensure that the total dollar amount of loan repayments over six years would be nearly three times the disbursed dollar amount.

31. Perhaps worst of all, BHG's electronic promissory note purports to be secured by "All Property," of "every description," owned by either Rosell or Celyn. By these terms, such collateralized Property includes, without limitation, Rosell's primary residence. As a matter of federal law, BHG was required to disclose to Rosell her right to rescind "any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended." 15 U.S.C. § 1635. By its terms, BHG's loan to Rosell was indeed such a "credit transaction," yet BHG never disclosed to Rosell her statutory right to rescind this transaction in its entirety. *Id.*

**BHG Defrauds Plaintiff Stewart On Pinnacle's Behalf, And For Pinnacle's Benefit**

32. In or about July 2021, BHG either mailed or electronically transmitted to Stewart written advertisements for a financial loan. The advertisements offered quick funding for debt consolidation, with no impact to the borrower's credit report or credit score. Stewart initially responded to BHG's advertisement either by phone or online; but in either event, Stewart ended up speaking to a BHG salesperson by telephone.

33. During Stewart's phone conversation with BHG, the company reinforced its written advertisements to him, telling him: "we can do these [loans] without a credit hit." BHG proceeded to obtain information regarding Stewart's personal assets and income, which he truthfully stated as coming only from his full-time employment as a sales representative, for a credit card processing company. Stewart informed BHG that he was a homeowner, and that he intended to use any loan proceeds to pay down his existing credit card balances. Pinnacle Bank was specifically discussed during Stewart's phone conversations with BHG.

34. At BHG's request, Stewart gave BHG copies of his W-2 paystubs, as well as his personal income tax information.

35. Neither BHG nor Pinnacle ever requested or obtained any information from Stewart about any business he might own, or intend to own.

36. Upon reviewing Stewart's personal finances, BHG informed him that he qualified for a substantial cash loan.

37. Stewart does not recall filling out a loan application, but BHG subsequently sent him *pre-filled* loan documents for him to e-sign, and orally induced Stewart to e-sign them.

38. The standard, electronic promissory note BHG sent to Stewart identified Pinnacle Bank as the "Creditor." It identified the "Debtor" as "Wallace W. Stewart II d/b/a Wallace W. Stewart II, Consultant," even though Stewart had never worked as a "Consultant." The Pinnacle promissory note further stated that it was "FOR COMMERCIAL PURPOSES," even though Stewart had told BHG that he wanted the loan to help pay down his credit card debt.

39. The pre-filled, "COMMERCIAL" and "Consultant" language in Defendants' loan documents was verifiably false, and both Defendants knew this when they sent their pre-filled loan

documents to Stewart. Yet Stewart relied upon BHG's direct, fraudulent inducements to quickly and electronically sign the Pinnacle loan documents.

40. The Pinnacle promissory note and accompanying loan documents create crippling credit terms for Stewart. While the loan principal amount purports to be $84,512.80, Defendants actually disbursed less than $78,000 to Stewart, deducting more than $6,500 in origination fees from the disbursement. Defendants never disclosed their excessive origination fees to Stewart in the manner required by law for consumer loans. Likewise, Defendants never disclosed the loan's annual percentage rate ("APR") to Stewart in the manner required by law, even though the APR was approximately 18% or more.

41. The Pinnacle loan documents further prohibit borrower prepayments during the first two years of the loan's seven-year term. Such prepayment prohibitions are barred by applicable state law.

42. Perhaps worst of all, the Pinnacle promissory note purports to be secured by "All Property," of "every description," owned by Stewart. By such terms, the collateralized Property includes, without limitation, Stewart's primary residence. As a matter of federal law, Defendants were required to disclose to Stewart his right to rescind "any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended." 15 U.S.C. § 1635. By its terms, Defendants' loan to Stewart was indeed such a "credit transaction," yet Defendants never disclosed to Stewart his statutory right to rescind the transaction in its entirety. *Id.*

## CLASS ALLEGATIONS

43. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of themselves and all other individuals (the "Class") who

signed or co-signed a financial loan from Bankers Healthcare Group, LLC or Pinnacle Bank, in an amount of $20,000 or more, under a promissory note identifying the "Debtor" as a "Sole Proprietor" or as a natural person doing business as ("d/b/a") himself or herself.

44. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can be ascertained only through appropriate discovery, Plaintiffs believe that there are at least thousands, and potentially tens of thousands, of members of the proposed Class. Class members can be identified and located from database records maintained by both Defendants, and can be notified of the pendency of this action by electronic mail and/or regular mail, using the form of notice similar to that customarily used in class actions.

45. Plaintiffs' claims are typical of other Class members' claims, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of law, as complained of herein.

46. Plaintiffs will fairly and adequately protect Class members' interests and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

47. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a) whether Defendants violated the federal Truth-in-Lending Act, 15 U.S.C. §§ 1601, *et seq.*, in the ordinary course of their business of lending to supposed "Sole Proprietors";

(b) whether Defendants' standard form, adhesive promissory notes are subject to 15 U.S.C. § 1635;

(c) whether Defendants' written loan advertisements to Class members were materially false, deceptive, and misleading when disseminated by mail and/or electronically;

(d) whether Plaintiffs and the Class suffered damages as a result of Defendants' conduct, and the proper measure of such damages, and whether the Class is entitled to declaratory or equitable relief, including but not limited to rescission, permanent injunctive relief, restitution, disgorgement of profits, or other equitable relief; and

(e) whether Plaintiffs and the Class are entitled to reasonable attorneys' fees and expenses as a result of Defendants' wrongful conduct as set forth herein.

48. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, as the joinder of all members is impracticable. Furthermore, the damages suffered by individual Class members, of limited means, may not be sufficiently large to justify the significant financial expenses, delays, and burdens of individual litigation, thus making it difficult if not impossible for Class members to redress the wrongs done to them on an individual basis. There will be no substantial difficulty in managing this case as a class action.

### FIRST CAUSE OF ACTION
**Violations of Federal Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*
(On Behalf of Plaintiffs and the Class)**

49. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

50. At all relevant times, Plaintiffs were "consumers" and Defendants were "creditors."

51. Plaintiffs applied for loans from Defendants for personal debt-consolidation purposes, and provided Defendants with their personal financial information, and other personal information to facilitate their loan applications.

52. Defendants approved Plaintiffs for loans, and proceeded to offer and extend "consumer credit" to Plaintiffs within the meaning of the Truth-in-Lending Act, 15 U.S.C. §§ 1601, *et seq.* ("TILA"), and Regulation Z promulgated thereunder. Defendants, however, did not make the financial disclosures required by TILA and Regulation Z before offering and extending consumer credit to Plaintiffs. By way of example only, Defendants did not clearly and conspicuously disclose to Plaintiffs the "amount financed," the "finance charge," or the "annual percentage rate" of interest that would apply to their loans, nor did Defendants provide a proper "itemization of the amount financed." *See generally* 12 C.F.R. § 1026.18. Defendants' continuous failure to make TILA's mandatory disclosures prohibited Plaintiffs and the Class from being fully and lawfully informed of the true costs of their loans, relative to other credit options.

53. In determining Plaintiffs' eligibilities for their loans, Defendants were aware that Plaintiffs were consumers and full-time, W-2 employees who did *not* have or intend to start their own businesses as "Sole Proprietors." Defendants knew or reasonably should have known this because, *inter alia*: (a) Defendants solicited Plaintiffs as individuals; (b) in determining Plaintiffs' loan eligibilities, Defendants specifically required and reviewed Plaintiffs' W-2 paystubs and personal income tax information; and (c) Defendants never obtained *any* specific information from Plaintiffs regarding *any* business they might own, or intend to start. For these reasons (among others), Defendants were always aware that Plaintiffs did not intend to use the offered loan disbursements for business or commercial purposes, but instead intended to use the loan disbursements for personal, family, or household purposes.

54. Defendants fraudulently concealed the true fact that Plaintiffs' and other Class members' loan transactions were "consumer credit" transactions subject to federal and state consumer lending statutes and consumer protection statutes, by knowingly slipping *false* "Sole Proprietor" and "COMMERCIAL PURPOSES" language into their fine-print loan agreements and other loan documents, which Defendants deceptively transmit to consumers *who Defendants know are not business owners or entrepreneurs*. At all relevant times, Defendants were motivated to knowingly falsify the language in their loan documents sent to consumers like Plaintiffs for several reasons, including but not limited to:

(a) Defendants can make more money on their fake, "commercial loan" agreements than they can on legitimate, consumer loan agreements containing proper financial disclosures;

(b) disguising consumer loan transactions as "commercial loan" agreements is Defendants' attempt to avoid the "clear and conspicuous" disclosure requirements of TILA and Regulation Z, and to avoid regulatory scrutiny, allowing Defendants to continuously hook consumers into expensive, fully secured loans *before* consumers are fully informed of all the extreme and predatory terms in Defendants' loans; and

(c) according to an annual report of Pinnacle Financial Partners, Inc., "BHG currently operated in most states without the need for a permit or any other license[,] *as its loans are principally commercial, business purpose loans that don't trigger the need for licensure. In the event that BHG or its subsidiaries were required to register or become licensed in any state in which they operate, including as a result of their expanding into consumer lending . . . , BHG's results of operations (and Pinnacle*

*Financial's and Pinnacle Bank's interest in BHG's net profits) could be materially and adversely affected.*"

55. In sum, Defendants have knowingly inserted false "commercial" and "sole proprietor" language into their loan documents sent to consumers, to fraudulently disguise "consumer credit" transactions as "commercial" credit transactions. Defendants' purpose in disguising their consumer lending as "commercial" lending is to evade federal and state regulatory scrutiny, and to increase their own profits at the expense of unsuspecting consumers like Plaintiffs.

56. Defendants' have collaborated to fraudulently conceal the true nature of Plaintiffs' and the Class's loan agreements for the particular purpose of evading TILA, Regulation Z, and many other federal and state consumer protection laws and authorities. In doing so, Defendants have violated TILA and Regulation Z, and caused Plaintiffs and the Class to suffer significant financial losses.

### SECOND CAUSE OF ACTION
### Violations of Federal Truth in Lending Act, 15 U.S.C. § 1635
### (On Behalf of Plaintiffs and the Class)

57. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

58. Defendants knowingly lured Plaintiffs into a "consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in . . . property which is used as the principal dwelling of the person to whom credit is extended." 15 U.S.C. § 1635(a). In such a "case," the "obligor shall have the right to rescind," and the "creditor shall clearly and conspicuously disclose" such right to rescind to the consumer. *Id.*

59. Defendants, as "creditor[s]," did not make the clear and conspicuous disclosures to Plaintiffs required by 15 U.S.C. § 1635(a), despite Defendants' loans to Plaintiffs being expressly

secured by "all property of every description" belonging to Plaintiffs. By its plain terms, such property includes Plaintiffs' real property, including Plaintiff Rosell's and Plaintiff Stewart's "principal dwelling[s]." *Id.* Yet Plaintiffs remained uniformed and unaware of their statutory rights of rescission at all relevant times, because Defendants failed to disclose Plaintiffs' statutory rescission rights at all relevant times.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Fed. R. Civ. P. 23, certifying Plaintiffs as Class Representatives, and the law firm of Finkelstein & Krinsk LLP as Class Counsel;

B. Requiring Defendants to pay the actual damages sustained by Plaintiffs and the Class by reason of the acts, omissions and transactions alleged herein, plus punitive damages for the fraudulent conduct alleged herein;

C. Awarding Plaintiffs and the Class additional statutory damages in the aggregate amount of $1 million, pursuant to 15 U.S.C. § 1640(a);

D. Awarding Plaintiffs and other members of the Class prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees, and other costs and expenses of this litigation;

E. For an order granting Plaintiffs and the Class direct notice and a reasonable opportunity to rescind their loan transactions with Defendants, pursuant to 15 U.S.C. § 1635(g);

F. For an order of Class-wide restitution, and an order for the disgorgement of Defendants' ill-gotten gains from the unlawful conduct alleged herein;

G. For an order enjoining Defendant from continuing to engage in the unlawful and unfair business acts and practices as alleged herein; and

H. Awarding such other relief as this Court may deem just and proper.

Dated: October 17, 2023

Respectfully submitted,

**FINKELSTEIN & KRINSK LLP**

By: *s/ David J. Harris, Jr.*
David J. Harris, Jr., Esq. (*pro hac vice* pending)

djh@classactionlaw.com
501 West Broadway, Suite 1260
San Diego, California 92101
Telephone: (619) 238-1333

*Lead Counsel for Plaintiffs and the Class*

**DOMBROW LAW FIRM**

By: *s/ Russell W. Dombrow*
Russell W. Dombrow, Esq.
N.D.N.Y Bar Roll No. 516948
N.Y.S. Atty. Reg. No. 4847661
**DOMBROW LAW FIRM**
499 South Warren Street, Suite 405
Syracuse, NY 13202 – 2628
Telephone: (315) 4097709
Russell@DombrowLawFirm.com

*Local Counsel for Plaintiffs and the Class*